```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------X
UNITED STATES OF AMERICA      :

          - v -               :            _____

                                           07 Cr. 997 (JGK)
FELIX CRUZ                     :

              Defendant.      :
----------------------------X
```

### POST HEARING MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT FELIX CRUZ'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS

**LEONARD F. JOY, ESQ.**
Federal Defenders of New York
Attorney for Defendant
**Felix Cruz**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8760

**ROBERT M. BAUM, ESQ.**

Of Counsel

TO:  MICHAEL J. GARCIA, ESQ.
     United States Attorney
     Southern District of New York
     One St. Andrew's Plaza
     New York, New York 10007
     Attn:  **Christian R. Everdell, ESQ.**
            Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------X
UNITED STATES OF AMERICA      :

            - V -             :

**FELIX CRUZ**                :

            Defendant.    :
----------------------------X

                                    **07 Cr. 997 (JGK)**

**POST-HEARING MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT FELIX CRUZ'S
MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS**

**PRELIMINARY STATEMENT**

        Defendant Felix Cruz, by undersigned counsel, respectfully
submits this Post-Hearing Memorandum of Law in support of his
Motion to Suppress physical evidence and statements.

**EVIDENCE AT THE HEARING**

        A. <u>The Arrest For Trespass On April 3, 2007</u>

        Officer Alejando Ponce was the only witness to testify
regarding the arrest of Felix Cruz and subsequent seizure,
pursuant to that arrest, of 19 bags of alleged crack cocaine.

        Officer Ponce testified that he was driving an unmarked
police vehicle with his partner, officer Benitez in the passenger

                              1

seat. See Transcript of suppression hearing held on February 26, 2008 ("Tr.") at pp. 157 and 159. From either 3-4 car "widths," (Tr. at 174), or 3-4 car "lengths" (Tr. at 199), he observed what he believed was a drug transaction between two individuals. Tr. at 172. They were standing in a courtyard to a building within an area with a wrought iron gate leading to the courtyard. Tr. at 164. The courtyard measured approximately 12 "feet" by 12 "feet." Tr. at 164-65.

Felix Cruz was identified as one of these individuals, who was holding a bag of crack. Tr. at 174. The other individual was holding money in his hand. Tr. at 173. When officer Ponce exited his vehicle, he observed the individual with the currency go into the building, while Mr. Cruz walked to the street, (Tr. at 175), acting in a calm manner. Tr. at 176. Officer Ponte also acknowledged that when he testified before a state grand jury, he stated that he had "directed" Mr. Cruz to step out from the wrought iron gate into the street. Tr. at 197. According to officer Ponte, he observed Mr. Cruz place the bag of crack in his pants near the waistband area, (Tr. at 175), in the back of his pants. Tr. at 193-94.

Officer Ponte testified on direct examination that he made these observations through the open door and the gate area. Tr. at 179. On cross-examination, he testified that Mr. Cruz was not standing near the open door to the gate. Tr. at 198. Government

2

Exhibit 3 demonstrates that the gate has a mesh fence which obstructs the view from the middle of the fence to the bottom.

What officer Ponte claims to have observed, was Mr. Cruz holding a clear plastic bag less than 1 inch square with a piece of crack inside that was less than 1 inch square. Tr. at 200. This observation was made from either 3 to 4 car "lengths" away (Tr. at 199), or 3 to 4 car "widths" away. Tr. at 174.

After observing what he believed to be a drug transaction, officer Ponte did not tell Felix Cruz he was under arrest. Tr. at 192. He did not draw his weapon. Tr. at 176. He approached Mr. Cruz and asked him three questions (Tr. at 192-3), in a "nonchalant" tone of voice. Tr. at 177. He did not ask any questions related to drugs. Tr. at 202. Each of the questions related to the issue of trespass. Tr. at 193. After Mr. Cruz answered the questions, officer Ponte arrested him for trespass. Tr. at 193. He acknowledged that in his testimony before the grand jury, he never told the grand jury that he made the arrest because of narcotics. Tr. at 197. Although his partner, officer Benitez, arrested another individual, it was not the person he claimed to have seen with Mr. Cruz. Tr. at 223.

Although officer Ponte believed that Mr. Cruz placed the drugs in the back of his pants, he made no attempt to retrieve the narcotics. Tr. at 194. He testified that he won't search an individual in the street. Tr. at 194. However, he did conduct a

frisk which included the area of clothing he believed contained narcotics, and did not feel anything. Tr. at 217-18. The frisk occurred as he was asking questions, and prior to any arrest. Tr. at 176-77.

According to officer Ponte, the courtyard to the building is not open to the public because that is what the sign on the building outside the courtyard indicates. Tr. at 209. He considered someone to trespass at any point inside the courtyard. Tr. at 209. However, upon further examination, he admitted that the sign does not say that. Tr. at 209. Regardless, when asked "...what is it in the posting that allows you to arrest trespassers, what gives you that impression?" He responded that the posting is in front of the building. "Therefore, anybody behind that posting is subject to arrest." Tr. at 225-26.

On the day of the arrest, the gate to the courtyard was open to the street. Tr. at 202. Government Exhibit 4 shows, and officer Ponte confirms, that within the courtyard, at the front door to the building, there is an intercom system to contact residents of the building. Tr. at 203. Although officer Ponte claims that the gate was not open on every occasion he visited the building, he cannot recall how he entered the courtyard on any single occasion that the gate was not open. Tr. at 204-05.

Officer Ponte claimed that he could not answer questions regarding measurements, that is why he uses a car "width." Tr. at

4

205. He also can't describe in feet what a car "width" is. Tr at 206. When asked on cross-examination, to describe in feet how far inside the gate Mr. Cruz was standing, he answered "I don't know, sir."  When pressed for an answer, he responded, "[Y]ou are asking me to do measurements. I do police work." Tr at 208. When asked similar questions on direct examination, he testified that the courtyard measured 12 **feet** in width and 12 **feet** in length. Tr. at 164-65. Although he claimed that he was not good with feet as a measurement because he learned the metric system (Tr. at 219), he could not answer questions about measurement using the metric system either. Tr. at 224. He contradicted prior testimony when he stated that he prefers to use car "lengths" not "widths." Tr. at 224.

On the way to the precinct, officer Ponte testified that Mr. Cruz, seated in the back seat, made incriminating statements although he was not asked any questions. Tr. at 185. Prior to making those statements, Mr. Cruz had not been given his Miranda rights either at the time of his arrest on the street, or at any time thereafter. Tr. at 185.


B. The Arrest Inside Apartment 3B On May 2, 2007


 The government called two witnesses to testify. Officer Kurt Maier testified that he and three other officers entered the

5

premises at 1756 Topping Avenue on a routine check looking for signs of criminal activity. Tr. at 25. There was an odor of marijuana which grew stronger as they approached the third floor. Tr. at 30. On the third floor landing, there was a female standing outside of apartment 3B. Tr. at 34. The odor of marijuana was coming from 3B. Tr. at 34. The female, later identified as Miriam Moreno, was standing in the threshold of the doorway and her attention was on the door. Tr. at 35-6.

Officer Maier testified that he saw Ms. Moreno "fiddling" with the door. Tr. at 50. Her hands were in the area of the doorknob which was missing, and "she was trying to stick her fingers in there." Tr. at 50. She was either trying to enter the apartment or leave. Tr. at 34. Officer Maier acknowledged that even without a handle, the door closes. Tr at 49. In fact, when he returned to the apartment after the arrest, the door was closed. Tr. at 49. If the door were closed, it is fair to say that someone would be fiddling with it attempting to open it. Tr. at 51.

Officer Maier testified that he approached Ms. Moreno and asked her a series of questions. Tr. at 36. He asked for her name, whether she lived in the apartment, and what she was doing there. She did not respond to these questions. Tr. at 37. After each question he waited for her to respond. Tr. at 63.  As he was talking to her, he saw two individuals inside the apartment. Tr.

6

at 37-8.

Officer Maier testified that he saw Felix Cruz packaging crack. Tr. at 39-40. However, the Criminal Court Complaint which he signed and swore to, did not contain any statement about Mr. Cruz packaging crack. Tr. at 70. He entered the apartment with Lt. McMahon and the other officers behind him. Tr. at 40. He went directly to the couch in the living room. Tr. at 41. From the time he first approached Ms. Moreno in the doorframe to the time he entered the apartment and arrested Mr. Cruz, a few seconds elapsed. Tr. at 42. He questioned Mr. Cruz. Tr. at 42.

When officer Maier met with federal prosecutors to discuss the facts of this case, he told them that he was able to make his observations through a crack between the door frame and the hinges. Tr. at 51. He told prosecutors that his observations were made in an opening that is approximately one to one and one half inches. Tr. at 52. He also said that he thought the door opened to the right. Tr. at 38. At the meeting, he reviewed his notes concerning the arrest, including the arrest report and the complaint filed in state court. He didn't change anything he said about the observations having been made through an opening of approximately one to one and one half inches during the entire half hour meeting. Tr. at 52-3. According to officer Maier, during the meeting, "[I]t took us a while to figure it out." Tr. at 79.

After the meeting with the federal prosecutors, he went back to the building to "refresh his recollection" and found that he couldn't have made the observations he stated at the meeting, because the door opened in the opposite direction. Tr at 54. Viewing the building and the apartment door also refreshed his recollection that instead of making the observations through a small 1 to 1½ inch space, his observations were made through a doorway half open, with a viewing area of a foot or more. Tr. at 54. The change was the "reverse" from what he remembered. Tr. at 55. It was attributable to the fact that after going back and determining that he could not have made the observations that he related at the meeting if the door opened to the right, "[T]he entire situation became more clear." Tr. at 54.

After the arrest of Mr. Cruz, he was handcuffed and subsequently questioned. Tr. at 42-3, and 66. One of the responses Mr. Cruz gave is that he was going to sleep with the woman next to him in the apartment and have sex with her. This conversation occurred around midnight. Tr. at 69. At no time was Mr. Cruz read his <u>Miranda</u> rights. Tr. at 68.

Lt. Paul McMahon testified that he led three other officers up the stairs of 1756 Topping Avenue on the night of May 2, 2007. Tr. at 100. He saw a woman, later identified as Miriam Moreno, in the entryway to apartment 3B. Tr. at 103. She was just standing there, not fiddling with the door in any way. Tr. at 124. He

passed her behind him to other officers. Tr. at 108. He put his head past the threshold of the doorway and looked around the corner in order to see. Tr. at 131-32.  Unless another officer behind him or to the side placed his head inside the threshold the same way he did, they wouldn't be able to see into the living room. Tr. at 133. He later testified that he "thought" that someone standing on the left side of the door would be able to see into the living room, but he never stood in that area to make that determination. Tr. at 149.

After observing Felix Cruz in the living room, he immediately entered, and the other officers followed. Tr. at 112. He was first to enter. Tr. at 112. Officer Maier entered the apartment within 10 seconds of the woman leaving the front of the door area. Tr. at 150. Within that 10 second period, he never heard anyone ask any questions of the woman. Tr. at 151.

Lt. McMahon handcuffed Mr. Cruz and questioned him. Tr. at 116-17. Mr. Cruz was also questioned in the station house. Tr. at 140. He wasn't given <u>Miranda</u> warnings at the scene or at the station house. Tr. at 140.

In addition to the testimony, the parties have stipulated that assistant District Attorney Andres Gill would testify that he met with officer Maier to discuss the arrest. He does not recall specifically what officer Maier told him, but it is his practice to write down as accurately as possible a summary of the

conversation. The summary does not contain everything the officer has told him. Exhibit 3503-S is received in evidence as a prior inconsistent statement.

Exhibit 3503-S reflects that officer Maier told an assistant district attorney shortly after the arrest of Mr. Cruz, that through the open door to the apartment, the officers observed defendant Austin and defendant Murphy, not Mr. Cruz and a female. It was only during a limited sweep of the apartment, that the officers observed Mr. Cruz and a female, Ms. Menendez, seated on a couch in the living room.

**ARGUMENT**

I.          **THE EVIDENCE SEIZED ON APRIL 3, 2007
            WAS A DIRECT RESULT OF AN ARREST MADE
            WITHOUT PROBABLE CAUSE IN VIOLATION OF
            THE FOURTH AMENDMENT AND MUST BE SUPPRESSED**

   A. Mr. Cruz Was Not Arrested For A Narcotics Offense

It is axiomatic that in a hearing conducted to suppress evidence, the credibility of witnesses is within the sole discretion of the Court. Reasonable inferences to be drawn from the testimony of officer Ponce, demonstrate that he did not observe a drug transaction and illegally arrested Felix Cruz for trespass. Mr. Cruz contends that he was arrested for trespass solely because he was present speaking to another individual in

10

the courtyard. Officer Ponce has testified that he believed that
anyone present in the courtyard is subject to arrest for
trespass. The defense contends that Officer Ponce made up the
story about the drug transaction to cover for the fact that he
did not properly search Mr. Cruz after the arrest for trespass
and was then concerned that the drugs recovered from the back of
his car had to be attributed to someone. His partner, officer
Benitez, had also arrested someone and officer Ponce incredibly,
could not remember if his partner or the other prisoner were in
the car. Without the observations he claimed, the drugs could
have been attributed to either arrested individual. This is also
why Ponce testified that he could not remember whether the other
prisoner was in the car. It is unlikely that Ponce would have
left his partner standing alone on the street with a prisoner.

It is illogical, on the facts presented, to believe that
officer Ponte observed a drug transaction. His testimony on this
issue is incredible for the following reasons:

1. When officer Ponte exited the car and approached Mr.
Cruz, he did not immediately arrest him for the drug transaction
he allegedly observed.

2. He questioned Mr. Cruz in a "nonchalant" manner only
about trespass, not about drugs.

3. When he did arrest Mr. Cruz, it was solely for trespass.
He never even told the grand jury that the arrest was due to

11

narcotics.

4. He frisked Mr. Cruz **before** he placed him under arrest, as he was asking questions. This clearly indicates that he was conducting a <u>Terry</u> stop, and did not have probable cause at this point for any arrest, negating his claimed observations.

5. He never made any attempt to retrieve the drugs despite his claim that he saw exactly where Mr. Cruz placed them. In addition, during the frisk, he included the location where the drugs were allegedly secreted and did not feel 19 bags containing a rock like substance, crack.

6. He claims to have observed Mr. Cruz holding one bag which was one inch by inch and that inside that bag he saw a rock like substance, that was even smaller than one inch by one inch. These observations were made from a distance and through a wrought iron fence with mesh covering obstructing the view.

7. No effort was made to apprehend the other person in an alleged drug transaction.

8. There was no evidence that Mr. Cruz was ever handcuffed, in fact the evidence would not support that assertion since Mr. Cruz was able to reach behind and into his pants to take out 19 plastic bags. It is inconceivable that Mr. Cruz would be arrested for a serious narcotics offense and not be handcuffed, particularly when placed in a car that did not have a partition between the prisoner and the officers. However, trespass is the

most minor infraction under New York law, and he might not have
been handcuffed for that offense.

    B. <u>Mr. Cruz's Arrest For Trespass Was Without Probable Cause</u>

    Officer Ponce did not have probable cause to arrest Mr. Cruz
for trespass based on the evidence adduced during the hearing.
Mr. Cruz was alleged to be in a courtyard adjacent to the
building entrance at 203 East 175 street. The courtyard is gated,
but on the day of his arrest, the door to the courtyard was open
to the street. Once entering the courtyard, the evidence
demonstrates that the entrance to the building has an intercom
system which allows someone to communicate with a tenant and be
buzzed into the building through the locked entrance door. The
open gate, and the intercom system, make it clear that the
courtyard area is open to the public. The "Operation Clean Halls"
sign on the side of the building does not forbid or warn the
public that entry to the courtyard could constitute a trespass.
And although officer Ponce claimed that Mr. Cruz did not know
anyone in the building, the person with whom he was standing in
the courtyard, went into the locked building entrance when Mr.
Cruz went to the street. This clearly raises the strong inference
that he was a tenant.

    It is not controverted that Mr. Cruz was arrested on the

street outside the entrance to 203 East 175 street. Officer Ponce stated that he was arrested for trespass. An arrest without probable cause, is in violation of the Fourth Amendment. <u>Dunaway v. New York</u>, 442 U.S. 200 (1979).  Following an arrest without probable cause, it is axiomatic that the fruit of the poisonous tree, the initial illegality, is subject to the exclusionary rule. <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).

    C. <u>Officer Ponte Engaged In An Unauthorized Terry Stop With No Basis To Believe That Mr. Cruz Had Engaged In Criminal Activity. The Ensuing Questions And Answers Must Be Suppressed And Cannot Form A Basis For Probable Cause To Arrest For Trespass</u>

If the sole basis for the stop and questioning of Mr. Cruz was due to officer Ponce's belief that Mr. Cruz had trespassed in the courtyard, the stop was unauthorized and the ensuing questions and answers may not be used as a basis for probable cause.

Officer Ponte could have stopped Mr. Cruz for a brief investigatory detention, as long as that stop was based upon "a reasonable suspicion supported by articulable facts" that criminal activity 'may be afoot.'" This is a narrowly drawn exception to the probable cause requirement of the Fourth Amendment. <u>United States v. Sokolow</u>, 490 U.S.1, 7 (1989)(quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968).

In the instant case, the evidence must be suppressed because

officer Ponce initially did not have a reasonable, articulable basis to believe that Felix Cruz had committed or was about to commit a crime.  A <u>Terry</u> stop requires that there be specific articulable facts that reasonably warrant suspicion of criminal activity. Even then, the Fourth Amendment requires some minimal level of objective justification for making the stop. <u>INS v. Delgado</u>, 466 U.S. 210, 216-217 (1984). None exists.

The Clean Halls program, gives permission to the police to enter certain premises for the purpose of investigating trespass or other illegal activities. It does not serve as authorization to bypass the constitution and make unauthorized arrests or illegal detentions. <u>See</u> <u>People v. Powell</u>, 180 Misc. 2d 627, 634 (Supreme Court, Bronx County, 1999). (The Clean Halls form does not provide a basis to believe that a particular person is involved in a situation in which criminal activity is afoot any more than presence in a high crime area standing alone provides such a basis). The form "does not diminish the rights of the individuals who are found there." <u>Id</u>. at 634.

In <u>Powell</u>, the Court suppressed evidence obtained following an arrest of the defendant who was observed to be in the courtyard of a building with a Clean Halls affidavit on file with the police. Although there was no evidence in <u>Powell</u> that the Courtyard was gated, the court found that the courtyard was open to the public with open access to the street. In addition, there

15

were no signs posted, "informing those who came into the courtyard that they were not permitted entry or that the courtyard access was limited." Id. at 633.

New York Penal Law § 140.05 states that a trespass occurs when a person knowingly enters or remains unlawfully in or upon premises. "Premises" may include a building or real property. However, Penal Law § 140.00(5) provides that "[A] person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain." (emphasis added).

In United States v. Breedlove, 424 F.Supp. 2d 379 (D. Conn. 2006), the district court suppressed evidence seized without probable cause based on an arrest for trespass. In Breedlove, the owner of property had filed a complaint with police about trespassers and criminal activity on his property, and authorized police to investigate criminal offenses on his property. The defendant was stopped by police and questioned as to his presence in an area that had a "No Trespassing" sign. According to the officer's testimony, the defendant said he knew he couldn't be on the property and had no explanation for being there. Id. at 383. At that point he was arrested.

The district court held that because of the characteristics of the premises, and local state law, the defendant did not as a

16

matter of law, commit the crime of trespass, and it was not reasonable to believe that the defendant's presence on the premises constituted criminal activity. Id. at 384. The decision was based upon the fact that there was no posting forbidding trespassing in the area the defendant was found. In addition, the area was open to the public. Id. at 385.

Officer Ponce testified that he believed that anyone behind the sign on the outside of the building was subject to arrest. He also believed, mistakenly, that the sign gave him the authority to arrest someone.

For all of the foregoing reasons, the stop, detention and arrest of Mr. Cruz were in violation of his Fourth Amendment rights and all evidence derived therefrom must be suppressed.


**II.          MR. CRUZ'S STATEMENTS MADE IN THE
              POLICE CAR MUST BE SUPPRESSED AS
              FRUIT OF THE FOURTH AMENDMENT VIOLATION**

Under the fruit of the poisonous tree doctrine, evidence acquired directly or indirectly as a result of an illegal search or arrest must be excluded. Wong Sun v. United States, 371 U.S. 471 (1963). Under certain circumstances, the suppression of evidence is not mandatory. The Court must determine "whether granting establishment of the primary illegality, the evidence to which instant objection is made, has been come at by exploitation of that illegality or instead by means sufficiently

17

distinguishable to be purged of the primary taint." Id. at 488.
Thus, the tainted evidence may be admissible if the government
can show that the causal connection between the evidence and the
unlawful conduct is "so attenuated as to dissipate the taint."
Id. at 487, (quoting Nardone v. United States 308 U.S. 338, 341
[1939]).

In finding whether statements are sufficiently attenuated
from the unlawful arrest, courts must examine the facts of each
case. Brown v. Illinois, 422 U.S. 590 (1975). Relevant factors to
consider include "[t]he temporal proximity of the arrest and the
confession, the presence of intervening circumstances, and
particularly, the purpose and flagrancy of the official
misconduct." Id. at 603-604. No single factor is sufficient to
show attenuation.

In Brown, the defendant had been illegally arrested and
confessed about two hours later. Despite noting that the
confession was preceded by Miranda warnings, the Supreme Court
found that attenuation was not shown. The issuance of Miranda
warnings alone is insufficient to remove the taint of an illegal
arrest.

> If Miranda warnings, by themselves, were held
> to attenuate the taint of the unconstitutional
> arrest, regardless of how wonton and purposeful
> the Fourth Amendment violation, the effect of the
> exclusionary rule would be substantially diluted.

Id. at 602.

18

In _Dunaway_, the defendant's arrest was in violation of his Fourth Amendment rights. Despite subsequent _Miranda_ warnings, the Supreme Court suppressed the statement on the grounds that there did not exist any intervening events which broke the connection between the illegal detention and the confession. In _Taylor v. Alabama_, 457 U.S. 687 (1982), the Supreme Court reaffirmed its holdings in _Dunaway_ and _Brown_, suppressing a confession given six hours after arrest, finding no intervening circumstances. The subsequent confession, issued after Miranda warnings, similar to the circumstances in _Brown_, _Dunaway_ and _Taylor_, did not provide the intervening circumstances necessary to dissipate the taint of the initial illegality. Similarly, Mr. Cruz's statements are not subject to any intervening event which would dissipate the taint from the initial illegality and thus warrant suppression.

_Oregon v. Elstad_, 470 U.S. 298, 308 (1985), held that _Miranda_ does not require the fruits of otherwise voluntary statements to be suppressed as inherently tainted due to a procedural failure to administer warnings followed by a subsequent voluntary waiver. However, the Court made it clear that a _Miranda_ violation differs from a Fourth Amendment violation which traditionally results in a broad application of the fruit of the poisonous tree doctrine. _Id_. at 306. In _Wong Sun_, _supra_ 371 U.S at 486 n. 12, the Court suppressed defendant's statements, citing cases where voluntary acts of a defendant were

19

held insufficient to cure otherwise unlawful acquisitions of evidence.

Similarly, Mr. Cruz's otherwise spontaneous statements, made while in custody in a police car on the way to the precinct, within minutes of his illegal arrest, have not been sufficiently attenuated to warrant their admission as evidence. The exclusionary rule is meant to put the government in the same position it would occupy had the police misconduct not occurred. Nix v. Williams, 467 U.S. 431, 443 (1984). The government has the burden of proving that the taint has been alleviated. Brown v. Illinois, supra, 422 U.S. at 604.

Under similar circumstances, In United States v. Duffy, 796 F.Supp. 1252 (District of Minn. 1992), the district court suppressed physical evidence and statements following a Fourth Amendment violation. The statements suppressed were spontaneous statements in a police car while being transported to jail following an illegal arrest.

III.          **THE WARRANTLESS ENTRY BY POLICE INTO AN APARTMENT ON MAY 3, 2007, RESULTING IN THE ARREST OF FELIX CRUZ AND THE SEIZURE OF PHYSICAL EVIDENCE WAS IN VIOLATION OF THE FOURTH AMENDMENT**

Mr. Cruz contends that the credible testimony at the hearing demonstrates that police officers pushed open the door to apartment 3B, because they smelled marijuana coming from the

20

apartment. Their warrantless entry was in violation of the Fourth Amendment.

Although police officers Maier and McMahon testified that the door to apartment 3B was at least partially open when they approached the landing, the stark inconsistencies in their testimony regarding the circumstances surrounding their entry into the apartment and the arrest of Mr. Cruz, render their statements incredible as a matter of law.

Their testimony differs in substantive ways such that it is clear that neither version is accurate, and that the testimony is tailored to meet constitutional objections:

1.    Officer Maier testified that the woman in the hallway was "fiddling" with the front door as if she was trying to enter or leave. Her hands were in the area of the doorknob and she was trying to stick her fingers in there. Lt. McMahon never saw the woman doing anything with the door. She was standing in the threshold with the door open.

2. Officer Maier approached the woman and asked her a series of questions, waiting for her response after each question.  Lt. McMahon encountered the woman and passed her to the other officers. He never heard anyone ask any questions.

3. As officer Maier was talking to the woman, he saw two individuals inside the apartment. Lt. McMahon put his head past the threshold of the door and around the corner in order to make

21

the observations he claimed to have made. He said that unless another officer placed his head inside the apartment threshold, the same way he did, they wouldn't be able to see into the living room.

4. Officer Maier claims to have seen Mr. Cruz and a woman in the living room packaging crack. However, he told an assistant District Attorney shortly after the arrest that he saw defendants Austin and Murphy through the open door. He saw Mr. Cruz and the woman after he conducted a sweep of the apartment. He acknowledged that the factual portion of the state court criminal complaint contains no mention of anyone packaging drugs.

5. Officer Maier told federal prosecutors when he met with them prior to the hearing, that he made his observations through a 1 to 1 ½ **inch** opening between the door frame and the hinge of the door, which opened to the right. He said that he realized the door opened to the left when he went to the scene to refresh his recollection. His visit to the scene also incredibly resulted in a change in his testimony concerning the manner in which he made his observations. Subsequent to that visit, he testified that his observations were made through a partially open door in a space of 1 to 1 ½ **feet**. When he made the initial statement concerning the ability to make his observations, it was after review of his notes and reports. It turned out to be the "reverse" of what he initially remembered.

22

6. According to officer Maier, he entered the apartment first. According to Lt. McMahon, he entered the apartment first.

7. According to officer Maier, he questioned Mr. Cruz in the apartment. According to Lt. McMahon, he questioned Mr. Cruz in the apartment.

Mr. Cruz contends that the reasonable inferences to be drawn from the testimony is that Ms. Moreno was "fiddling" with the door which was closed, either trying to enter the apartment or close the door having just exited. At that point, the officers came to the landing. They questioned Ms. Moreno who refused to answer their questions. Lt. McMahon and the other officers could smell the marijuana coming from the apartment. Rather than secure the area and wait, or knock on the door, Lt. McMahon pushed open the door slightly and stuck his head in. He made observations that caused him to enter the apartment with the other officers behind him.

A warrantless entry into a home without consent or exigent circumstances is unconstitutional. Payton v. New York, 445 U.S. 573 (1980). The government bears the heavy burden of proving that entry into the home was justified. United States v. Zabare, 871 F.2d 282, 289 (2d Cir. 1989), (citing Coolidge v. New Hampshire, 403 U.S. 443 (1971)). Even if the police had reasonable suspicion that a crime was being committed within the home, based on their smell of marijuana, they may not enter in this fashion. Payton v.

New York, supra 445 U.S. at 589. Nor are they authorized to enter if they had lawfully observed a crime being committed within the apartment, and had probable cause, unless exigent circumstances existed. Id.

The police may make observations inside a private home as long as they are in a place where they are entitled to be. United States v. Fields, 113 F.3d 313, 321-22 (2d Cir. 1997)(police may make observations through window where the interior is exposed to public view). However, as Fields holds, even after viewing defendants bagging cocaine, the warrantless entry into the apartment on probable cause was justified only because of exigent circumstances. In Fields, the officers were aware of the defendant's reputation for violence and ultimately recovered a firearm. they also had reason to believe that the defendant might flee or destroy evidence when alerted to the presence of the police. None of those circumstances were proven here. The immediate entry into the apartment upon making observations was done without any reflection or analysis concerning alternatives or exigencies. The government showed no exigent circumstances.

In addition, even accepting Lt. McMahon's version of the facts, he physically crossed the threshold of the premises by extending himself into the apartment and around a corner of the hallway to make the observations which led him to enter. There was no probable cause at that time and certainly no exigent

24

circumstances to warrant such actions. Possession of marijuana is a relatively minor crime under New York state law. Depending upon the amount, which was unknown to the officers in the hallway, the offense is not even a misdemeanor. The officers had no knowledge of the identity of anyone in the apartment, nor whether weapons were involved.

The entry into apartment 3B was in violation of the Fourth Amendment, and the physical evidence derived from the illegal entry and search must be suppressed.

IV.          **All STATEMENTS MADE BY MR. CRUZ FOLLOWING HIS ARREST IN THE APARTMENT MUST BE SUPPRESSED PURSUANT TO THE FIFTH AMENDMENT HAVING BEEN OBTAINED IN VIOLATION OF HIS MIRANDA RIGHTS**

Although officer Maier and Lt. McMahon do not agree who questioned Mr. Cruz once he was placed under arrest in the apartment, they both agree that the custodial interrogation was conducted without advising him of his <u>Miranda</u> rights. Accordingly, the statements must be suppressed as a result of a Fifth Amendment violation.

**CONCLUSION**

For the foregoing reasons, Felix Cruz respectfully requests that the Court issue an order suppressing the physical evidence and statements illegally obtained in violation of his Fourth Amendment rights, as a direct result of an arrest and seizure

25

made without probable cause, and suppression of statements

obtained in violation of his rights under the Fifth Amendment,

and for such other and further relief as the Court deems just and

proper.

Dated:  New York, New York
        March 17, 2008

                              Respectfully submitted,

                              LEONARD F. JOY, ESQ.
                              Federal Defenders of New York

                    By:_____
                              **ROBERT M. BAUM, ESQ.**
                              Assistant Federal Defender
                              Attorney for Defendant
                                   **FELIX CRUZ**
                              52 Duane Street - 10th Floor
                              New York, New York 10007



26TO:          MICHAEL J. GARCIA, ESQ.
          United States Attorney
          Southern District of New York
          One St. Andrew's Plaza
          New York, New York 10007

ATTN:     Christian R. Everdell, Esq.
          Assistant United States Attorney