UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA            :       MEMORANDUM OF LAW

        - v. -                      :       07 Cr. 997 (JGK)

FELIX CRUZ,                         :

            Defendant.              :

- - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW
## IN RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

### PRELIMINARY STATEMENT

        The Government respectfully submits this Post-Hearing

Memorandum of Law in further response to defendant Felix Cruz's

motion to suppress.  As the testimony of Officer Alejandro Ponce

at the suppression hearing demonstrated, the arrest of the

defendant on April 3, 2007, in front of 203 East 175th Street,

was supported by probable cause, and the defendant's statements

in the police car were spontaneous.  Therefore, the crack

recovered from the back seat of the police car and the

defendant's statements are properly admissible at trial.

        Furthermore, the testimony of Officer Kurt Maier and

Lieutenant Paul McMahon at the suppression hearing demonstrated

that the defendant exposed his drug packaging activity to public

view through the open door of Apartment 3B at 1756 Topping Avenue

in the Bronx, on May 2, 2007, and therefore did not have a

reasonable expectation of privacy that give rise to Fourth Amendment protection. The evidence also established that the warrantless entry of Apartment 3B was supported by exigent circumstances. Accordingly, all of the physical evidence seized inside the apartment in plain view is admissible at trial, as are the statements Cruz gave the police in response to basic pedigree questions. Cruz's suppression motion therefore should be denied in its entirety.

**APRIL 3, 2007 ARREST**

A.    Summary of Testimony

At the suppression hearing, the Government called Police Officer Alejandro Ponce of the New York City Police Department ("NYPD") to discuss the arrest of the defendant on April 3, 2007. According to Officer Ponce, on the morning of April 3, 2007, he and his partner, Police Officer Benitez, were on routine anti-crime patrol in Sector Adam, a high crime area in the 46th Precinct in the Bronx known for its heavy drug activity. (Tr. 157-58). The officers were in plain clothes and traveling in an unmarked police car. (Tr. 157). Officer Ponce was driving and Officer Benitez was next to him in the front passenger seat. (Tr. 159). At approximately 7:30 a.m., the officers were traveling northbound on Weeks Avenue, approaching the corner of East 175th Street. (Tr. 157, 159). At the intersection, Officer

2

Ponce took a right hand turn onto East 175th Street and began traveling eastbound. (Tr. 159, 161-62, GX 1).

As Officer Ponce drove down East 175th Street he passed by the entrance to the apartment building located at 203 East 175th Street (the "Premises"), which is on the north side of the street. (Tr. 162, GX 1). The Premises has an interior courtyard that leads to the front door. (Tr. 164, GX 4). The courtyard is closed off from the sidewalk by a metal gate, which spans the entrance to the courtyard, and is accessible by a door in the gate. (Tr. 164, GX 2, GX 3). On the exterior wall of the Premises, to the left of the metal gate and facing the sidwewalk, is posted a metal sign, which states, "Attention. Patrolled by NYPD's Operation Clean Halls. Trespassers subject to arrest." (Tr. 165; GX 2, GX 5). The owner of the Premises has also filed a "Clean Halls Affidavit" with the 46th Precinct, which gives the NYPD permission and authority to enter the Premises and arrest all those who have no legitimate purpose to be on the Premises, such as trespassers. (Tr. 165-66, 170-72, GX 6, GX 13).

At the time Officer Ponce was driving past the Premises, it was daylight and he was traveling at approximately 5-10 miles per hour, which is his typical patrol speed. (Tr. 172). As he passed by the entrance of the Premises, he saw the defendant with an unidentified male facing each other inside the

3

courtyard of the Premises, behind the gate, about three to four
car widths away from him. (Tr. 172-74). The door of the gate
was all the way open at the time, and Officer Ponce could see the
two men through the open door and through the mesh of the metal
gate. (Tr. 173, 179). Officer Ponce noticed that the
unidentified male was holding a quantity of cash and that the
defendant was holding a plastic bag containing what appeared to
be crack cocaine. (Tr. 173-74, 191). The defendant was holding
the bag of crack between his thumb and index finger, with his
index finger pointed downwards, which made the bag stick out and
drew Officer Ponce's attention to the bag of crack. (Tr. 219-
20).

        Believing he was witnessing an attempted drug
transaction, Officer Ponce stopped the car, got out, and walked
towards the courtyard where the two individuals were. (Tr. 172-
173). Officer Benitez got out of the car at the same time as
Officer Ponce, but Officer Ponce did not know where Officer
Benitez went after that. (Tr. 175-76). When two men in the
courtyard noticed Officer Ponce approaching, the unidentified
male went into the building, while the defendant put the bag of
crack in his back waistband area and walked out of the courtyard
and onto the sidewalk. (Tr. 174-76).

        Officer Ponce approached the defendant, who was by that

4

time in front of the building to the right of the gate, and
questioned him in a calm tone of voice. (Tr. 176-77, 180). At
the same time, Officer Ponce gave the defendant a quick pat down
to see if he was carrying any weapons. (Tr. 176-77, 180).
Officer Ponce asked the defendant if he lived in the building or
knew anyone in the building. (Tr. 177). The defendant responded
that he did not live in the building or know anyone in the
building. (Tr. 177-78). When Officer Ponce asked the defendant
for identification, the defendant gave Officer Ponce a New Jersey
address. (Tr. 177-78). Officer Ponce then placed the defendant
under arrest for trespassing and for the attempted drug
transaction. (Tr. 178, 194-95). The entire encounter, from when
Officer Ponce first noticed the attempted drug transaction to the
arrest of the defendant, took at most one minute. (Tr. 178). In
the meantime, Officer Benitez had arrested another individual,
who was not the unidentified male involved in the attempted drug
transaction with the defendant. (Tr. 180-81, 223-24).

After Officer Ponce placed the defendant under arrest,
he put him in the back of his police car and drove him to the
46th Precinct for arrest processing. (Tr. 181). During the
drive back to the precinct, Officer Ponce could see the defendant
acting nervous and jittery through the officer's rear-view
mirror. (Tr. 183). Officer Ponce told the defendant to stop

5

moving around, but did not ask him any questions.  (Tr. 185).

Shortly thereafter, the defendant stated, in sum and substance,

"Look man, I have crack" and "I'm on federal probation," and

"Look, I was honest with you.  Can I get a break, or a summons?"

(Tr. 184-85, 190).  The defendant then reached into his waistband

and took out 19 bags of crack and put them on the back seat of

the police car.  (Tr. 184-85).  Officer Ponce did not respond in

any way to these statements, nor were the statements in response

to any questions posed by Officer Ponce.  (Tr. 190).

When they reached the precinct, Officer Ponce recovered

the 19 bags of crack from the back seat and vouchered them.  (Tr.

186-87).  Officer Ponce also recovered and vouchered $462 in cash

from the defendant, which was in the following denominations: 87

$1 bills, 14 $10 bills, 8 $20 bills, and 15 $5 bills.  (Tr. 187-

88).

B.   Applicable Law

Probable cause to arrest exists when "the facts and

circumstances within [the officers'] knowledge and of which they

had reasonably trustworthy information [are] sufficient in

themselves to warrant a man of reasonable caution in the belief

that an offense has been or is being committed."  United States

v. McFadden, 238 F.3d 198, 204 (2d Cir. 2001) (quoting United

States v. Cruz, 834 F.2d 47, 50 (2d Cir. 1987)).  To establish

probable cause, "it is not necessary to make a prima facie
showing of criminal activity or to demonstrate that it is more
probable than not that a crime has been or is being committed."
United States v. Cruz, 834 F.2d 47, 50 (2d Cir. 1987) (quotation
omitted); accord United States v. Ginsberg, 758 F.2d 823, 828 (2d
Cir. 1985).  Rather, probable cause merely requires a "fair
probability" under the "totality of the circumstances" that the
defendant to be arrested has committed a crime.  Illinois v.
Gates, 462 U.S. 213, 238 (1983).  To determine whether probable
cause existed for an arrest, a court must "examine the events
leading up to the arrest, and then decide 'whether these
historical facts, viewed from the standpoint of an objectively
reasonable police officer, amount to' probable cause."  Maryland
v. Pringle, 540 U.S. 366, 371 (2003) (quoting Ornelas v. United
States, 517 U.S. 690, 696 (1996)); see also United States v.
Patrick, 899 F.2d 169, 171 (2d Cir. 1990) (probable cause exists
"if the law enforcement official, on the basis of the totality of
the circumstances, has sufficient knowledge or reasonably
trustworthy information to justify a person of reasonable caution
in believing that an offense has been or is being committed.").

     A police officer may also conduct a brief
"investigative detention" by stopping a person to investigate
possible criminal behavior, so long as at the time the officer

7

effects the stop, the officer has "'reasonable suspicion' to
believe that criminal activity has occurred or is about to
occur." United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995)
(citing United States v. Glover, 957 F.2d 1004, 1008 (2d Cir.
1992)); see also Terry v. Ohio, 392 U.S. 1 (1968). "Reasonable
suspicion" arises when law enforcement officers are able "to
point to specific and articulable facts which, taken together
with rational inferences from those facts, reasonably warrant
[the] intrusion [on a citizen's liberty interest]." United
States v. Elmore, 482 F.3d 172, 178-79 (2d Cir. 2007) (quoting
Terry, 392 U.S. at 21). The test for reasonable suspicion is a
"rather lenient" one, United States v. Santana, 485 F.2d 365, 368
(2d Cir. 1973), and "can be established with information that is
different in quantity or content than that required to establish
probable cause . . . [and] can arise from information that is
less reliable than that required to show probable cause."
Alabama v. White, 496 U.S. 325, 330 (1990). Moreover, reasonable
suspicion is measured from the perspective "of a reasonable and
cautious police officer on the scene, guided by his experience
and training." United States v. Colon, 250 F.3d 130, 134 (2d
Cir. 2001) (quoting United States v. Oates, 560 F.2d 45, 61 (2d
Cir. 1977)).

        It is well-settled that a suspect must be advised of

8

the rights specified in <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436, 479 (1966), before he may be subjected to custodial interrogation. Thus, for the protections of <u>Miranda</u> to apply, the suspect must not only be in custody, but also be "subjected to questioning" by persons the suspect knows are acting on behalf of the state. <u>Id.</u> at 478. As the Supreme Court made clear in <u>Miranda</u> itself, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." <u>Id.</u>; <u>see also</u> <u>United States</u> v. <u>Compton</u>, 428 F.2d 18, 22 (2d Cir. 1970) ("spontaneous utterance" made by defendant when taken into custody, prior to administration of <u>Miranda</u> warnings, admissible because not the result of police interrogation). The Supreme Court defined the term "interrogation" under the <u>Miranda</u> rule as "express questioning or its functional equivalent." <u>Rhode Island</u> v. <u>Innis</u>, 446 U.S. 291, 300-01 (1980). The "functional equivalent" of interrogation consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 301. Where there has been no interrogation under this definition, the suspect's statements are admissible even if the suspect was in custody when he made the statements. <u>Id.</u> at 300, 302-03.

9

C.    Discussion

Officer Ponce's testimony regarding his observations of the defendant and the unidentified male inside the courtyard of the 203 East 175th Street (the "Premises"), as well as the circumstances leading up to the arrest, establish that Officer Ponce had probable cause to believe that the defendant was engaged in a drug sale.  Officer Ponce clearly recalled seeing the defendant and an unidentified male standing inside the courtyard of the Premises, facing each other, and engaged in conversation.  (Tr. 173-74).  Officer Ponce noticed that the unidentified male was holding a quantity of cash in his hand, and that the defendant was holding a plastic bag containing what appeared to be crack cocaine between his index finger and thumb.  (Tr. 173-74, 219-220).  Officer Ponce also observed the two men split up as soon as he got out of the police car, and saw the defendant furtively place the bag of crack into his back waistband area, while exiting the courtyard.  (Tr. 174-76).  All of these observations indicated to him that the defendant had just attempted to complete a drug sale.  (Tr. 172).

The clarity of Officer Ponce's recollection is supported by a number of factors.  First, the area was illuminated by early morning daylight when he passed by the Premises at approximately 7:30 a.m., making visibility easy.

10

(Tr. 172). Second, Officer Ponce was driving by the Premises at
a very slow speed (5-10 mph), specifically for the purpose of
observing criminal activity that might be occurring, giving him
ample time to see what was going on in the courtyard. (Tr. 172).
Indeed, Officer Ponce had just turned the corner from Weeks
Avenue onto east 175th Street when he passed by the courtyard,
suggesting that he was traveling slowly. (Tr. 159). Third,
Officer Ponce had a clear line of sight to the men in the
courtyard because the door to the courtyard was fully open at the
time, and he could see them directly out of the driver's side
window from a distance of only about three to four car widths
away. (Tr. 173-174). And fourth, the defendant was holding the
plastic bag of crack downwards between his thumb and index
finger, which had the effect of drawing Officer Ponce's attention
directly to it. (Tr. 219-220). Having been involved in over 500
drug arrests and being familiar with the way crack cocaine is
packaged (Tr. 154), Officer Ponce was able to identify it
immediately as a bag of crack cocaine. (Tr. 173). Furthermore,
given his experience with drug arrests, Officer Ponce was able to
recognize that the defendant and the unidentified male were
engaged in a drug transaction. (Tr. 173).

        Combined with these specific observations indicating
that a drug deal was taking place, Officer Ponce's assessment of

11

probable cause was also informed by his awareness of the
surrounding circumstances.  At the time he observed the two men
in the courtyard of the Premises, Officer Ponce was patrolling in
Sector Adam - an area of the 46th Precinct that he knew to have
heavy drug trafficking activity.  (Tr. 158).  Officer Ponce,
himself, had made drug arrests in Sector Adam on prior occasions,
including arrests in the vicinity of the intersection of Weeks
Avenue and East 175th Street, where the Premises is located.
(Tr. 158-59).

        Taking all of these circumstances into account, it is
clear that Officer Ponce had probable cause to arrest the
defendant for possession and/or attempted sale of narcotics.
See, e.g., United States v. Vasquez, 297 F. Supp. 2d 696
(S.D.N.Y. 2004) (probable cause to arrest existed where a police
officer conducting surveillance in a known drug area observed
defendant hand an item to another individual in exchange for
cash); Montes v. King, No. 00 Civ. 4707 (RCC), 2002 WL 424318, at
*4 (S.D.N.Y. March 19, 2002) (probable cause existed where police
officer observed an individual handing another individual a
baggie in exchange for money).  Accordingly, Officer Ponce could
have arrested the defendant for a suspected drug deal even before
he asked the defendant any questions on the sidewalk.  However,
after satisfying himself that the defendant did not possess any

12

weapons by conducting a brief pat-down frisk (Tr. 177), Officer
Ponce instead prudently asked the defendant a few basic questions
to assess the situation, which ultimately established probable
cause to arrest the defendant for trespassing.

Even if Officer Ponce did not have probable cause to
arrest the defendant, at the very least he had "'reasonable
suspicion' to believe that criminal activity [had] occurred"
sufficient to justify a brief "investigative detention" under
Terry.  Tehrani, 49 F.3d at 58.  In addition to the drug
transaction he witnessed, which would already give him adequate
grounds to question the defendant, Officer Ponce had reasonable
suspicion to believe that the defendant was trespassing on the
Premises.  The defendant appeared to be engaged in a transaction
with another man inside the courtyard, and did not appear to be
going in or out of the building.  (Tr. 173-74).  The two men also
immediately split up and went in opposite directions when they
noticed Officer Ponce approaching, suggesting that the defendant
had no legitimate purpose for being on the Premises.  (Tr. 174-
75).  Added to this, the building was protected by the "Clean
Halls Program," with a sign indicting this clearly posted on the
outside of the building.  (Tr. 165, GX3, GX 5).  Officer Ponce
testified that he believed the "Clean Halls" affidavit on file
with the NYPD for the Premises gave him the authority to enter

13

the Premises and arrest trespassers, including those inside the gated courtyard. (Tr. 171-72, GX 6, GX 13). As such, Officer Ponce had a reasonable suspicion that the defendant was either dealing drugs or simply trespassing in the building and had the authority to stop him and question him.

Officer Ponce's investigation was brief, consisting of only three questions. Officer Ponce asked the defendant if he lived in the building or if he knew anyone in the building. (Tr. 177-78). The defendant responded in the negative to both questions. (Tr. 177-78). Officer Ponce then asked him what his address was. (Tr. 177-78). The defendant gave him a New Jersey address. (Tr. 177-78). At that point, Officer Ponce had established that the defendant was not a resident or a guest of anyone in the building, and had no legitimate purpose to be on the Premises. Accordingly, he had probable cause to arrest the defendant for trespass, which he did. See People v. Ruiz, 2007 WL 1428689, at *2 (N.Y. Sup. Ct. May 15, 2007) (citing People v. Quinones, 2002 N.Y. Slip Op. 50091(U), App. Term, 1st Dep't (March 5, 2002)) (probable cause to arrest defendant for trespass existed for defendant in Quinones, who was found in the lobby of a building with a "buzzer system," because he did not live in the building and could not identify a resident he was there to

14

meet).[1]

Because Officer Ponce's arrest of the defendant was supported by probable cause, the 19 bags of crack recovered from the back seat of the police car is properly admissible, as are the statements which the defendant made to Officer Ponce in the car on the way back to the 46th Precinct. Although Officer Ponce did not read the defendant his Miranda rights before putting him in the car, the officer did not ask the defendant any questions or engage the defendant in any way. (Tr. 183-85, 190). In particular, the defendant's statements about "having crack" were not made in response to any questioning or statement by Officer Ponce. At most, Officer Ponce told the defendant to stop moving, which is not a communication "reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301. Accordingly, the defendant's statements were spontaneous and are admissible. Id. at 300, 302-03.

--------------------------------------------

[1]     It seems self-evident that the courtyard area of the Premises was not "open to the public," despite the fact that the door of the gate was open. If that were the case, there would be no purpose in erecting the gate in the first place, because the courtyard would effectively be the same as the sidewalk and the gate would have no effect in keeping out trespassers, which was clearly the desired result. Moreover, a reasonable police officer on the scene certainly would have thought that the gate was meant to exclude trespassers, giving the officer an adequate basis to question anyone in the courtyard with no apparent legitimate purpose.

## MAY 2, 2007 ARREST

A.    Summary of Testimony

At the suppression hearing, the Government called
Police Officer Kurt Maier and Lieutenant Paul McMahon of the NYPD
to discuss the arrest of the defendant on May 2, 2007.  According
to the testimony of these officers, on the evening of May 2,
2007, Officer Maier and Lieutenant McMahon were on routine patrol
with Police Officers Jaime Pedraza and Damon Valentino in Sector
Adam, a high crime area in the 46th Precinct in the Bronx known
for its heavy drug activity.  (Tr. 21-24, 97-99).  The officers
were in "modified uniform," which is a full duty uniform with a
windbreaker instead of a jacket, and traveling in an unmarked
police car.  (Tr. 22, 97-98).

At approximately 12:00 a.m., as the officers were
driving on Topping Avenue, Officer Maier noticed people milling
around near the front of the building located at 1756 Topping
Avenue, which was indicative of drug activity.  (Tr. 24).  The
officers decided to do a "vertical" in the building, which a type
of foot patrol where officers ascend and descend the floors of a
building checking the common areas - such as the staircases,
landings, vestibules, lobby, etc. - for criminal activity.  (Tr.
24-25, 99-100).  The building at 1756 Topping Avenue is a
converted Victorian house that has approximately three floors,

16

with two apartments per floor, and an interior staircase that
leads up to the floors.  (Tr. 25-26, 120, GX 7-12).

        When the officers entered the lobby of the building
both Officer Maier and Lieutenant McMahon testified that they
smelled an odor of marijuana and communicated that to the other
officers.  (Tr. 30-32, 100).  The officers began ascending the
staircase to see where the odor was coming from and to assess
whether there was any other criminal activity occurring in the
building.  (Tr. 32, 100).  Lieutenant McMahon was in front,
Officer Maier was behind him, and Officers Pedraza and Valentino
were following behind Officer Maier.  (Tr. 33, 101-02).  As the
officers ascended the stairs, the odor of marijuana got stronger.
(Tr. 30, 34, 102).  By the time they got to the second floor,
Lieutenant McMahon heard voices and movement on the third floor
above him.  (Tr. 102).

        As the officers approached the third floor landing,
Lieutenant McMahon and Officer Maier smelled a strong odor of
marijuana and saw marijuana smoke emanating from the doorway of
Apartment 3B (the "Apartment"), which was directly to their
right.  (Tr. 34, 104, GX 9-11).  The door to the Apartment was
open and a female, later identified as Miriam Moreno, was
standing in the threshold of doorway on the left-hand side of the
door frame.  (Tr. 33-36, 103-05).  At the time, Ms. Moreno's

17

attention was directed towards the door, and appeared to be either entering or leaving the Apartment. (Tr. 34-36, 104-05). The door to the Apartment did not have a doorknob, and at least one of the lock cylinders was missing. (Tr. 29, 107, GX 11). The hinges of the door were on the left-hand side of the door frame, where Ms. Moreno was standing, and the door swung into the Apartment and to the left and did not close by itself. (Tr. 36, 77, 106-07, GX 11).

Officer Maier and Lieutenant McMahon approached Ms. Moreno. (Tr. 36, 105). Lieutenant McMahon testified that Ms. Moreno noticed him approaching and gave a look of alarm or surprise. (Tr. 105-06). He put his finger up to his mouth to indicate to Ms. Moreno to be quiet and motioned her back to the officers behind him. (Tr. 106, 108). Lieutenant McMahon then took up a tactical position on the right-hand side of the door frame. (Tr. 109). Officer Maier went to the left-hand side of the door frame where Ms. Moreno was, and briefly asked her what her name was and what she was doing in the apartment. (Tr. 36-37). Ms. Moreno did not respond to Officer Maier's questions. (Tr. 37). Officer Maier testified that Ms. Moreno had a dirty and disheveled appearance, and was incoherent, indicting to him that she was a drug user. (Tr. 37).

From where Officer Maier was standing and talking to

18

Ms. Moreno - on the left-hand side of the door frame - he could
see directly into the living room of the Apartment, which was to
the right of the doorway as you enter the Apartment, after a
short hallway of a few feet.  (Tr. 39, 57).  Officer Maier stated
that the door was open about halfway, and that it did not
obstruct his view of the living room in any way.  (Tr. 38, 51).
Officer Maier saw a man later identified as the defendant, Felix
Cruz, sitting in the living room on a couch approximately 10-15
feet away from the officer.  (Tr. 38-40).  Next to the defendant
on the couch was a female later identified as Bianca Menendez.
(Tr. 40).  In front of the defendant was a table, and on the
table was a large pile of what appeared to be crack cocaine, as
well as several small ziplock bags, some of which already
contained what appeared to be crack cocaine.  (Tr. 39-40).  The
defendant appeared to be packaging the crack.  (Tr. 39-40).

From his vantage point to the right of the door frame,
Lieutenant McMahon could not see what was inside the apartment to
the right, so he leaned his head in the doorway and looked down
to the right.  (Tr. 109).  When he did this, he saw exactly what
Officer Maier saw - the defendant sitting on a couch in the
living room, which was to the right of the door frame, about 10
feet away from him.  (Tr. 109, 112).  Lieutenant McMahon saw a
large pile of what appeared to be crack cocaine on a table in

19

front of the defendant, as well as small ziplock bags, some of
which were empty and some of which were full.  (Tr. 109-112).
The defendant had a razor in his hand and appeared to Lieutenant
McMahon to be "bagging up," or packaging, the crack.  (Tr. 109-
112).  Lieutenant McMahon testified that the door to the
Apartment was open about 90 degrees and did not obstruct his view
of the living room in any way.  (Tr. 110, 129-30).

        Upon seeing this, Officer Maier and Lieutenant McMahon
entered the Apartment and quickly moved towards the couch in the
living room, where the defendant was seated and where they had
seen the crack.  (Tr. 40-41, 113-14).  Officers Pedraza and
Valentino entered the Apartment shortly thereafter.  (Tr. 40,
112).  Neither Officer Maier, nor Lieutenant McMahon could recall
whether they had their guns drawn when they entered the
Apartment, but both said it would not have been unusual for them
to do so under these circumstances for safety reasons, given that
it appeared that the defendant was packaging drugs and could have
been armed.  (Tr. 41, 114).  As he approached the living room,
Lieutenant McMahon identified himself as a police officer and
told the defendant and Ms. Menendez to show him their hands.
(Tr. 113).  Officer Maier and Lieutenant McMahon then arrested
the defendant and Ms. Menendez.  (Tr. 42, 116).  From the time
that Officer Maier and Lieutenant McMahon first approached Ms.

Moreno in the doorway of the Apartment to the time they arrested the defendant and Ms. Menendez, was approximately thirty seconds or less.  (Tr. 42, 116).

        After arresting the defendant and Ms. Menendez, Officer Maier asked the defendant his name and what he was doing in the apartment.  (Tr. 42).  The defendant responded, in sum and substance, that he was there with Ms. Menendez, and that he was getting married tomorrow and planned to have sex with Ms. Menendez before getting married.  (Tr. 42-43).  Officer Maier also called out to the other officers who were in the Apartment to see where they were and if they needed assistance.  (Tr. 43). Officers Pedraza and Valentino were in the bedroom of the Apartment, which was just to the left as you enter the front door of the Apartment.  (Tr. 43-44, 56, 117-18).  There they had arrested two others – a male and a female – and recovered a marijuana cigarette and some additional packaging material for the crack cocaine.  (Tr. 43-44, 117-18).  The female who was in the doorway – Ms. Moreno – was also arrested.  (Tr. 44, 119). From the living room, the officers also recovered 313 ziplock bags full of crack cocaine, two plastic bags containing what appeared to be crack cocaine, a marijuana cigarette, two razor blades, and other drug paraphernalia, all of which were vouchered back at the 46th Precinct.  (Tr. 44-45, 119-120).

21

B.    Applicable Law

        The Fourth Amendment's warrant requirement generally
protects the privacy interest that an individual enjoys in his
home or property.  See United States v. Gori, 230 F.3d 44, 50 (2d
Cir. 2000); United States v. Fields, 113 F.3d 313, 321 (2d Cir.
1997).  Thus, searches and seizures inside a home without a
warrant and probable cause to support it are presumptively
unreasonable.  See Payton v. New York, 445 U.S. 573, 586 (1980).
However, "[w]hat a person knowingly exposes to the public, even
in his own house or office, is not a subject of Fourth Amendment
Protection."  United States v. Santana, 427 U.S. 38, 42 (1976)
(quoting Katz v. United States, 389 U.S. 347, 351 (1967)); see
also Fields, 113 F.3d at 321 (no reasonable expectation of
privacy, and therefore no Fourth Amendment protection, in what a
person "chooses voluntarily to expose to public view").  For
example, there is no reasonable expectation of privacy in what
can be seen from a public hallway through the open door of an
apartment.  Gori, 230 F.3d at 53.

        Accordingly, defendants who conduct their criminal
activity within their homes, but in plain view of an area where
the police are entitled to be present, forfeit Fourth Amendment
protection over what they leave visible to the naked eye.  See
Fields, 113 F.3d at 321.  Such observations by the police may

22

provide both probable cause for an arrest and the exigent circumstances necessary to justify a warrantless entry into the residence to effectuate the arrest.  See id., 113 F.3d at 321-23 (warrantless entry into residence to effectuate an arrest justified by exigent circumstances where police stationed in side yard of building saw defendants packaging crack cocaine through window).

Exigent circumstances allow the police to enter a residence without a search warrant.  See United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990).  "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action."  MacDonald, 916 F.2d at 769 (citations omitted).  The test for determining whether a warrantless entry is justified by exigent circumstances is an objective one, assessed under the totality of the circumstances.  United States v. Medina, 944 F.2d 60, 68 (2d Cir. 1991).

In considering whether exigent circumstances exist to justify the warrantless entry into an apartment, courts should consider the following factors:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is

23

> reasonably believed to be armed; (3) a clear
> showing of probable cause . . . to believe
> that the suspect committed the crime;
> (4) strong reason to believe that the suspect
> is in the premises being entered; (5) a
> likelihood that the suspect will escape if
> not swiftly apprehended; and (6) the peaceful
> circumstances of the entry.

United States v. Medina, 944 F.2d 60, 68 (2d Cir. 1991) (quoting

United States v. MacDonald, 916 F.2d 766, 769-70 (2d Cir. 1990))

(internal quotations and citations omitted); accord Loria v.

Gorman, 306 F.3d 1271, 1285 (2d Cir. 2002).  These factors are

not an "'exhaustive canon, but an illustrative sampling of the

kinds of facts to be taken into account.'"  Loria, 306 F.3d at

1284 (quoting MacDonald, 916 F.2d at 770).  "Thus, the presence

or absence of any single factor is not dispositive."  Id.

Other factors that constitute exigent circumstances

justifying the warrantless entry of a home include the need to

prevent the destruction or moving of evidence, see, e.g., United

States v. Miles, 889 F.2d, 382, 383 (2d Cir. 1989); Medina, 944

F.2d at 69, and the risk of danger to the police or other persons

inside or outside the dwelling, Minnesota v. Olson, 495 U.S. 91,

100 (1990); United States v. Thomas, 372 F.3d 1173, 1177-78 (10

Cir. 2004); United States v. Lenoir, 318 F.3d 725, 730-31 (7th

Cir. 2003).

When arresting a person inside a residence, there are

two kinds of warrantless searches that the Supreme Court has
found permissible.  First, "as a precautionary matter and without
probable cause or reasonable suspicion, [the police may] look in
any closets and other spaces immediately adjoining the place of
arrest from which an attack could be immediately launched."
Maryland v. Buie, 494 U.S. 325, 334 (1990).  Second, where there
are "articulable facts which, taken together with the rational
inferences from those facts, would warrant a reasonably prudent
officer in believing" that there is within the home, "an
individual posing a danger to those on the arrest scene," the
officers may conduct a protective sweep of the home looking
wherever such a person might be hiding."  Id. at 334-35.  "The
small size of [an] apartment" is relevant to determining what
"immediately adjoins" the place of arrest, and courts have
repeatedly upheld searches of bedrooms and other rooms adjacent
to the room where the defendant was seized.  United States v.
Lauter, 57 F.3d 212, 213-14 (2d Cir. 1995) (upholding sweep of
adjoining bedroom after defendant was arrested in the first room
of the apartment); see also United States v. Hernandez, 941 F.2d
133, 135 (2d Cir. 1991) (upholding sweep of bedroom immediately
upon officers' entry into the apartment, when defendant was
arrested separately in the living room).

       Police officers, when lawfully in a particular location

25

within a residence, may seize evidence found in plain view.  See
Horton v. California, 496 U.S. 128, 133, 135-36 (1990).  A
warrantless seizure is justified under the plain view doctrine if
the officer has a legal right to be in the place from where he
sees the object subject to seizure and a "lawful right of access
to the object itself, and if the object's incriminating nature is
"immediately apparent."  Id. at 136-37; see also Gori, 230 F.3d
at 50 (warrant not required to seize "an item in plain view if
there is cause to believe that it is evidence of crime").

    C.  Discussion

       The testimony of Officer Maier and Lieutenant McMahon
demonstrated that at the time the officers approached the doorway
of Apartment 3B (the "Apartment"), the door was open, permitting
anyone standing on the left side of the door frame to have a
clear, unobstructed view of the living room where the defendant
was packaging a large amount of crack cocaine.  The testimony of
the two officers concerning their positions on the third floor
landing, the position and appearance of the door to the
Apartment, and the view into the Apartment was highly consistent.
Officer Maier said that he was positioned on the left-hand side
of the door frame, where Ms. Moreno had been standing, and that
Lieutenant McMahon was near him on the landing.  (Tr. 36-37).
Lieutenant McMahon said that after he motioned Ms. Moreno away

26

from the doorway, he took a tactical position on the right-hand side of the door frame, and although he could not remember which officer was with him on the landing, he did recall that another officer was "right with" him.  (Tr. 109, 126, 128).  Both officers testified that the door was missing a knob and one of the lock cylinders, that it was open about halfway, and that it did not obstruct the view to the right of the door frame, where the living room was located.  (Tr. 28-29, 36, 38, 106-07, 110). And both officers identically described the layout of the apartment as seen from the doorway: the living room opened up to the right after a short hallway of a few feet, and a bedroom was near the entrance of the Apartment.  Tr. (40, 56-57, 112, 117, 132).

        Furthermore, both officers testified to seeing almost exactly the same thing in the living room.  They both saw the defendant sitting on a couch, or some kind of chair, towards the back of the living room about 10-15 feet away from the doorway. (Tr. 39-40, 71-72, 112-13, 134-35).  Both remembered that what the defendant was sitting on was set off from the side wall of the living room by a few feet.  (Tr. 76-77, 148-49).  And both recalled that on the table in front of the defendant was a large pile of crack cocaine and several ziplock baggies, and the defendant was in the process of bagging up the crack.  (Tr. 39-

27

40, 109-12).

It is clear from this testimony that the defendant had exposed his criminal activity – namely, the fact that he was packaging a large quantity of crack cocaine – to public view through the open door of the Apartment. Indeed, the defendant in his affidavit disputes only whether the door was open, not whether the living room could be seen from the open doorway of the Apartment. See Def's Affidavit ¶ 6. As a result, he cannot claim a Fourth Amendment protection over what was seen by the officers on the third floor landing. See Gori, 230 F.3d at 53 (no reasonable expectation of privacy in what can be seen from a public hallway through the open door of an apartment). It is immaterial that Lieutenant McMahon was not able to see the living room area from his position at the right of the door frame until he extended his head over the threshold of the Apartment and looked to the right. (Tr. 131-32). The same view was clearly visible from Officer Maier's vantage point at the left-hand side of the door frame without needing to cross the threshold. (Tr. 38). Lieutenant McMahon agreed that the living room would be visible from that vantage point. (Tr. 149). Hence, this is not a case where the evidence leading to the arrest could only be seen by peering over the threshold. See United States v. Glenn, 288 F. Supp. 2d 346, 348-50 (W.D.N.Y. 2003). Accordingly,

28

Lieutenant McMahon peering across the threshold of the Apartment does not render the search of the Apartment unlawful.

Having seen the defendant bagging up a large quantity of what appeared to be crack cocaine, Officer Maier and Lieutenant McMahon had exigent circumstances to enter the Apartment without a warrant to execute the arrest. All of the six standard factors that bear on the question of exigency are met in this case. See Medina, 944 F.2d at 68.

First, the police had clear probable cause to believe that the defendant possessed, with the intent to distribute, a large amount of crack cocaine. Both Officer Maier and Lieutenant McMahon had been involved in hundreds of drug arrests in the past and were familiar with the way crack cocaine looks and is packaged for sale on the street. (Tr. 20-21, 95-97). Both could see from a distance of only 10-15 feet that the defendant was cutting off small slabs of crack cocaine from a larger rock on the table in front of him, and putting them in small plastic ziplock baggies, and that a number of baggies were already full. (Tr. 39-40, 109-111). This more than satisfies the criteria of "a clear showing of probable cause . . . to believe that the suspect committed the crime." Medina, 944 F.2d at 68.

Second, the officers had a "strong reason to believe that the suspect [was] in the premises being entered." Medina,

29

944 F.2d at 68.   In fact, they knew that the defendant was inside
the Apartment because they saw him packaging the crack through
the open door.

        Third, the amount of crack cocaine involved was large,
indicating that the offense was serious.   Lieutenant McMahon, who
had taken part in numerous drug arrests in the 46th Precinct,
testified that the pile of crack on the table in front of the
defendant struck him as "a large quantity of drugs."   (Tr. 111,
114).   In fact, 313 ziplock bags of crack were recovered from the
living room, which did not include the large pile of crack that
the defendant was still in the process of cutting up.   (Tr. 45,
3503-G).   This indicated that the defendant was a drug dealer,
and not simply a crack user, and plainly demonstrated to the
officers "the gravity . . . of the offense" with which the
defendant was to be charged.   Medina, 944 F.2d at 68.

        Fourth, as far as the officers were concerned, Cruz was
"reasonably believed to be armed."   Medina, 944 F.2d at 68.
Officer Maier testified that it was not uncommon for drug dealers
to carry firearms, or to have someone near them who carries a
firearm.   (Tr. 41).   Lieutenant McMahon testified that any time
there is a large quantity of drugs near by, there is a definite
potential for violence.   (Tr. 114).   These experiences, coupled
with the fact that the defendant was seen packaging a large

30

amount of crack cocaine, made it entirely reasonable for the officers to believe that the defendant used and possessed firearms to protect himself, his narcotics, and his narcotics proceeds from rival dealers and robbers. See United States v. Gaskin, 364 F.3d 438, 457 (2d Cir. 2004) (Second Circuit "has frequently observed [that] . . . guns are tools of the narcotics trade, frequently carried by dealers, particularly when they engage in transactions involving drugs or money"); United States v. Becerra, 97 F.3d 669, 671-72 (2d Cir. 1996) (reasonable to suspect that "drug dealers commonly keep firearms on their premises as tools of the drug trade"); United States v. Crespo, 834 F.2d 267, 271 (2d Cir. 1987) ("[T]o substantial dealers in narcotics, firearms are as much tools of the trade as are the commonly recognized articles of narcotics paraphernalia.").

Fifth, the circumstances of the officers' entry of the Apartment were certainly "peaceful," Medina, 944 F.2d at 68, given that they simply walked into the apartment through the open door, albeit with firearms probably drawn for their safety. (Tr. 41, 114).

Finally, had the defendant been alerted to the presence of the officers on the landing, there is a reasonable probability that he would have attempted to flee, or at least attempted to destroy the evidence of his drug dealing. Medina, 944 F.2d at

31

68; Fields, 113 F.3d at 323.  Officer Maier testified that the
couch on which the defendant was sitting was in front of a bay
window.  (Tr. 75).  The defendant might have tried to flee out
the window if he had known that police officers were outside the
door.  At the very least, the defendant likely would have tried
to dispose of the large quantity of crack on the table in front
of him.

          Moreover, there were few other viable options available
to the officers at that time but to enter the apartment.
Lieutenant McMahon had just motioned Ms. Moreno away from the
doorway of the Apartment.  It was quite possible that the
occupants of the Apartment might have noticed that she was
missing and gone to the doorway to see where she was, only to
find the officers waiting on the landing.  Such an encounter
could certainly have been more dangerous and confrontational that
simply entering the apartment.  It is equally plausible that Ms.
Moreno may have alerted the occupants to the presence of the
officers, which, again, could have led to a potentially dangerous
situation and to the destruction of evidence.  Finally, the
officers could not close the door to secure the Apartment because
the door did not close properly and closing it also might have
alerted those inside the Apartment to their presence and led to
the destruction of evidence.

Faced with these circumstances, and under the time pressure of a situation that called for an immediate decision, the officers made the reasonable determination to enter the Apartment to arrest the defendant.  This decision was reasonable in all the circumstances, and caused an intrusion that was no greater than necessary to alleviate the exigency.

Following his arrest, the defendant's responses to Officer Maier's routine questions concerning his identity, his address, and the reason for his presence in the Apartment (Tr. 42) were not subject to the protections of Miranda, and are properly admitted at trial.  See, e.g., United States v. Gotchis, 803 F.2d 74, 79 (2d Cir. 1986) (questions "normally attendant to arrest and custody," including "[r]outine questions . . . ordinarily innocent of any investigative purpose, do not pose the dangers that Miranda was designed to check.").

Once the defendant was arrested inside the Apartment, the officers were justified in conducting a limited security sweep of the bedroom, which was adjacent to the living room where the defendant was arrested, in order to ensure that there was no one in there who could attack the officers in the living room. United States v. Lauter, 57 F.3d 212, 213-14 (2d Cir. 1995) (upholding sweep of adjoining bedroom after defendant was arrested in the first room of the apartment); see also United

33

<u>States</u> v. <u>Hernandez</u>, 941 F.2d 133, 135 (2d Cir. 1991) (upholding sweep of bedroom immediately upon officers' entry into the apartment, when defendant was arrested separately in the living room). The crack cocaine, drug paraphernalia, and other items observed by the officers in plain view in the living room and in the bedroom therefore should be admissible at trial. <u>See</u> <u>Gori</u>, 230 F.3d at 50 (warrant not required to seize "an item in plain view if there is cause to believe that it is evidence of crime").

## CONCLUSION

For the reasons set forth above, defendant Felix Cruz's motion to suppress should be denied in all respects.

Dated:    New York, New York
          March 17, 2008

                         Respectfully submitted,

                         MICHAEL J. GARCIA
                         United States Attorney
                         Southern District of New York


                    By:  /s/ Christian R. Everdell
                         CHRISTIAN R. EVERDELL
                         Assistant United States Attorney
                         Telephone: (212) 637-2556

34

CERTIFICATE OF SERVICE

CHRISTIAN R. EVERDELL deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York.

That on March 17, 2008, he caused to be served a copy of the foregoing Government's Post-Hearing Memorandum of Law in Response to Defendant's Motion to Suppress by hand delivery on:

Robert M. Baum, Esq.
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, N.Y. 10007
(212) 417-8760

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. Section 1746.

/s/ Christian R. Everdell
CHRISTIAN R. EVERDELL

Executed on: March 17, 2008
            New York, New York

35