UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA            :        <u>MEMORANDUM OF LAW</u>

      - v. -                        :        07 Cr. 997 (JGK)

FELIX CRUZ,                         :

        Defendant.             :

- - - - - - - - - - - - - - - - - - -x

<u>GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW
IN FURTHER RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS</u>

<u>PRELIMINARY STATEMENT</u>

The Government respectfully submits this Post-Hearing
Memorandum of Law in response to defendant Felix Cruz's Post-
Hearing Memorandum of Law in support of his motion to suppress
("Def. Mem."). As set forth more fully below, the arguments
raised by the defendant in his post-hearing memorandum for why
the Court should disbelieve the testimony of Officers Ponce and
Maier, and Lieutenant McMahon, are unpersuasive and based on
unsupported speculation. As the Government previously argued in
its initial memorandum, the credible testimony at the suppression
hearing established that the arrests on April 3, 2007 and May 2,
2007, did not violate the defendant's Fourth Amendment rights,
and that the statements the defendant made after his arrests were
properly obtained. Accordingly, the defendant's motion to
suppress the physical evidence recovered after his arrests, as

well as his post-arrest statements to the police, should be
denied in its entirety.

### APRIL 3, 2007 ARREST

A.   <u>Officer Ponce's Had Probable Cause To Arrest The
     Defendant For Attempting To Sell Narcotics</u>

The defendant argues in his post-hearing memorandum
that Officer Ponce's testimony demonstrated that he did not
observe the defendant engaged in a drug transaction on April 3,
2007, and that he "made up the story about the drug transaction
to cover the fact that he did not properly search Mr. Cruz after
the arrest for trespass and was then concerned that the drugs
recovered from the back of his car had to be attributed to
someone." Def. Mem. at 10-11. The defendant then lists several
points drawn from Officer Ponce's testimony that allegedly
support this inference. <u>Id.</u> at 11-13. Contrary to the
defendant's assertions, these points are entirely consistent with
Officer Ponce's testimony that he observed the defendant engaged
in a drug transaction, giving him probable cause to arrest.

The defendant points out that after getting out of his
car, Officer Ponce did not draw his gun and immediately arrest
the defendant, but instead walked up to him and questioned him in
a "nonchalant" manner about why he was there. Def. Mem. at 3,
11. What these facts demonstrate is that Officer Ponce acted in

a prudent and responsible manner, and did not needlessly escalate the situation by being more confrontational than what was called for under the circumstances.  After all, Officer Ponce had not seen either the defendant or the unidentified drug purchaser holding a gun when he observed them in the courtyard of 203 East 175th Street (the "Premises").  It was also broad daylight when he saw them (Tr. 172), which meant that he could easily see and react to a threat, if one arose.  Furthermore, when Officer Ponce got out of his car to approach the two men, the unidentified purchaser fled inside the apartment building, and thus was no longer a threat, while the defendant tried to walk away, indicating that he did not plan to confront Officer Ponce.  (Tr. 174-76).

Absent any need for urgency or heightened caution, Officer Ponce kept a measured tone to his encounter with the defendant, frisking him only to see if he was concealing any weapons, and then asking him a few questions in a calm manner to see if he had any legitimate business at the Premises in order to more fully assess the situation.  (Tr. 176-78).  Officer Ponce's appropriately calibrated response was exactly how a well-trained officer who has made numerous drug arrests should have responded under these circumstances.

It is entirely consistent that Officer Ponce asked the

defendant questions about his presence at the Premises, and not about the drug transaction he had witnessed. *See* Def. Mem. at 11. As Officer Ponce himself explained, at the time he approached the defendant, in his mind "[the defendant] was not free to go anywhere," based on his observation of an attempted drug transaction. (Tr. 194). Hence, there was little to be gained by questioning the defendant about something Officer Ponce had already seen, and which the defendant would surely deny if asked. Instead, Officer Ponce asked the defendant three basic questions about his purpose for being at the Premises, which eventually established probable cause to arrest the defendant for trespass as well. (Tr. 177-78).

Officer Ponce's testimony before the Bronx grand jury also supports that he arrested the defendant for selling narcotics as well as trespass. Despite the defendant's assertions that Officer Ponce "never . . . told the grand jury that the arrest was due to narcotics," Def. Mem. at 11, Officer Ponce did, indeed, tell the grand jury that he witnessed an attempted drug sale, which led him to approach the defendant and question him. See 3501-I. Although Officer Ponce ultimately stated that the defendant was arrested for trespass, see id., the grand jury was well aware that Officer Ponce's observation of an attempted drug sale was what led to the defendant's arrest.

4

The defendant also points to the frisk that Officer Ponce conducted, claiming that it demonstrates that Officer Ponce did not observe a drug sale. The defendant asserts: (1) the fact that Officer Ponce conducted a frisk of the defendant before placing him under arrest shows that he was performing a Terry stop, and did not have probable cause to arrest, and (2) the fact that he did not retrieve the drugs during his frisk, despite knowing where the defendant had hidden them, indicates that he did not actually witness a drug deal. See Def. Mem. at 12.

The defendant, again, draws incorrect inferences from these facts. First, there is no rule that requires an officer, once he has probable cause to arrest, to immediately arrest the suspect and then afterwards perform any frisks or searches. Hence, the fact that Officer Ponce frisked the defendant for weapons and asked him questions before he formally placed the defendant under arrest does not in any way suggest that Officer Ponce did not have probable cause to arrest when he approached the defendant. To the contrary, as discussed above, this shows only that Officer Ponce decided to proceed calmly and make inquiries of the defendant before arresting him.

Second, Officer Ponce explained that his frisk of the defendant was not a thorough search and was solely to determine whether the defendant had any weapons on him that could harm him,

not to locate the drugs that the defendant had hidden in his waistband. (Tr. 177, 217).[1] Officer Ponce further testified that he looked in the area around the defendant and did not see the narcotics on the ground, so he knew that the drugs must still be on his person. (Tr. 194-95). As the defendant was already arrested, there would have been no point in searching him further on the street. (Tr. 194-95). The more prudent course was to return to the precinct and conduct a full search of the defendant there. As Officer Ponce testified, it is often dangerous for officers to linger in the streets with an arrestee in this neighborhood. (Tr. 182). Accordingly, Officer Ponce's actions were entirely consistent with a narcotics arrest supported by probable cause.

The defendant also mistakenly contends that Officer Ponce could not have observed the bag of crack in the defendant's hand from where he was positioned. See Def. Mem. at 12. Officer Ponce testified specifically about why he was able to see the bag of crack in the defendant's hand from where he was. Officer Ponce was only three to four car widths away and looking through

---

[1] It is evident from the testimony that when Officer Ponce stated that he did not feel anything in the defendant's waistband area, he was referring to weapons. (Tr. 217-18).

the open gate of the courtyard. (Tr. 172-74, 179).[2] Officer

Ponce also described in detail the way the defendant was holding

the bag of crack - pointing downwards between his thumb and index

finger - which made the bag "stick out" and which "brought [his]

focus to the bag," allowing him to immediately recognize it as a

bag of crack. (Tr. 219-20). Hence, the testimony clearly

establishes that Officer Ponce was able to see the bag of crack

from where he was in his car.

The defendant also asserts that Officer Ponce's failure

to arrest the other individual involved in the drug sale, and his

failure to handcuff the defendant after his arrest, indicate that

the arrest was for trespass and that there was no drug sale. See

Def. Mem. at 12-13. Both points are easily dismissed. As stated

above, when Officer Ponce approached the courtyard of the

Premises, the defendant and the unidentified male split up and

---

[2] Contrary to the defendant's assertions, see Def. Mem. 2-3, it
is clear from the testimony that Officer Ponce said he was three
to four car widths, not lengths, away from the defendant when he
saw him. (Tr. 174, 201, 205, 207, 209, 225). Indeed, any
confusion on this issue was caused by defense counsel misstating
Officer Ponce's prior testimony on cross-examination. (Tr. 201).
Furthermore, Officer Ponce did not give contradictory testimony
regarding his difficulty using feet to estimate distances. See
Def, Mem. at 5. Officer Ponce used feet only once during his
testimony to estimate the dimensions of the courtyard, but this
came after Officer Ponce was prompted to think about how many men
his height would fit across the courtyard. (Tr. 164-65). Hence,
only with reference to his own height was Officer Ponce able to
estimate feet.

the unidentified man fled into the building.  (Tr. 174-76).  At

that point, Officer Ponce had to choose whether to approach the

defendant, or pursue the other male.  The choice was easy.

First, the defendant was coming towards him, making it far easier

to approach him than the other male, who would have been hard to

locate inside the building.  Second, the defendant was the drug

seller, not the drug buyer, and was therefore a higher priority

target.  Third, it is quite possible that Officer Ponce believed

his partner would go after the drug buyer and therefore did not

focus on his arrest.

     With regard to handcuffing, while the defendant asserts

that there is no evidence that the defendant was handcuffed after

his arrest, there is also no evidence that he was not handcuffed.

In fact, the logical inference from Officer Ponce's testimony is

that the defendant was handcuffed, because he specifically

described how he kept a close eye on the defendant in the rear

view mirror on the ride back to the precinct to "ensure [his]

safety."  (Tr. 183).  It would stand to reason that anyone so

concerned about his safety would have handcuffed the defendant

before putting him in the car.  Moreover, it would have been easy

for the defendant, with his hands cuffed behind his back, to

reach into his back waistband area, where Officer Ponce saw him

put the bag of crack he was selling (Tr. 174-76), and pull out

8

the bags of crack that were secreted there.

Finally, the defendant's assertion that Officer Ponce made up the drug sale in order to pin the blame for the crack in the backseat of his car on the defendant is nothing more than speculation that is unsupported by any testimony. See Def. Mem. at 11. There is absolutely no evidence to suggest that the drugs belonged to anyone other than the defendant. There is no evidence that anyone other than the defendant was in the backseat of the car, and there were no drugs in the backseat when Officer Ponce left on patrol that morning. (Tr. 186). Furthermore, the defendant is simply incorrect that Officer Ponce could not recall whether Officer Benitez was in the car with him. Def. Mem. at 11. Officer Ponce remembered clearly that Officer Benitez was in the front passenger seat with him on the ride back to the precinct. (Tr. 181). Although Officer Ponce could not remember whether Officer Benitez's arrestee was also in the car with them (Tr. 181), there is absolutely no evidence to contradict that the drugs belonged to the defendant, or to suggest that Officer Ponce assigned blame for the drugs to the defendant. Such unfounded speculation should not be credited.

In sum, none of the points raised by the defendant cast doubt on the clear testimony of Officer Ponce that he observed the defendant engaged in a narcotics transaction and therefore

9

had probable cause to arrest him. <u>See, e.g.</u>, <u>United States</u> v. <u>Vasquez</u>, 297 F. Supp. 2d 696 (S.D.N.Y. 2004) (probable cause to arrest existed where a police officer conducting surveillance in a known drug area observed defendant hand an item to another individual in exchange for cash); <u>Montes</u> v. <u>King</u>, No. 00 Civ. 4707 (RCC), 2002 WL 424318, at *4 (S.D.N.Y. March 19, 2002) (probable cause existed where police officer observed an individual handing another individual a baggie in exchange for money).[3]

    B.    <u>Officer Ponce Had A Reasonable Suspicion To Believe That The Defendant Was Trespassing And Later Obtained Probable Cause To Arrest</u>

In addition to the drug transaction he observed, which gave Officer Ponce probable cause to arrest the defendant for attempted sale of narcotics, Officer Ponce also had a reasonable suspicion to believe that the defendant was trespassing on the Premises. Assuming, <u>arguendo</u>, that Officer Ponce could not have seen the bag of crack in the defendant's hand, he had still observed the defendant and another man facing each other and

-----

[3]  Even if the Court finds that Officer Ponce did not have probable cause to arrest the defendant for the narcotics transaction, the Government submits that, at the very least, Officer Ponce had a "reasonable suspicion" to believe that the defendant was engaged in a narcotics transaction, and therefore could stop and question the defendant, which ultimately gave him probable cause to arrest the defendant for trespass. *See* Section B *infra*.

engaged in some form of monetary transaction inside the gated
courtyard of the Premises. (Tr. 172-74). Neither man was going
in or out of the apartment building. The courtyard was blocked
off from the sidewalk by a high metal fence (GX-2), and a large
sign was posted on the left-hand side of the building which
clearly stated, "Attention: Patrolled by NYPD S 'Operation Clean
Halls' - Trespassers Subject to Arrest." (GX-5). Furthermore,
the building itself was in high drug trafficking area of the 46th
Precinct and Officer Ponce knew that building owners who took
part in the "Operation Clean Halls" program did so because they
either suspected criminal activity in their buildings, or that
trespassers were frequenting their buildings. (Tr. 155-58).
Finally, Officer Ponce saw the two men quickly split up when he
got out of his car to approach them. (Tr. 174-76).

Under these circumstances, Officer Ponce had a
reasonable suspicion to believe the defendant was trespassing and
had grounds to question him about his reasons for being in the
courtyard. See People v. Hendricks, 43 A.D.3d 361, 363 (1st
Dep't 2007) (defendant's presence in vestibule of building in
drug-prone neighborhood, with clearly posted sign forbidding
loitering and trespassing, enough to allow police to ask
questions to determine whether he was legitimately in the
building, even though defendant's activities "were not

11

necessarily indicative of criminality"); <u>People</u> v. <u>Medina</u>, 16
Misc. 3d 382, 390 n.4 (N.Y. Sup. Ct. 2007) (police could question
individual drinking beer in the lobby of a "Clean Halls" building
in a drug-prone area to determine whether he belonged there).

Upon questioning the defendant, Officer Ponce quickly
determined that he did not live in the building, that he did not
know anyone in the building, and that he lived in New Jersey.
(Tr. 177-78). This information was enough to establish probable
cause to arrest the defendant for trespassing. <u>See</u> <u>Hendricks</u>, 43
A.D.3d at 363 (probable cause to arrest for trespassing existed
where defendant, who was present in building in high crime area,
with posted sign prohibiting trespassers, did not live in the
building and could not identify a resident he was there to meet);
<u>People</u> v. <u>Ruiz</u>, 2007 WL 1428689, at *2 (N.Y. Sup. Ct. May 15,
2007) (citing <u>People</u> v. <u>Quinones</u>, 2002 N.Y. Slip Op. 50091(U),
App. Term, 1ˢᵗ Dep't (March 5, 2002)) (probable cause to arrest
defendant for trespass existed for defendant in <u>Quinones</u>, who was
found in the lobby of a building with a "buzzer system," because
he did not live in the building and could not identify a resident
he was there to meet); <u>see also</u> N.Y. Penal Law § 140.10(a) (a
person is guilty of criminal trespass in the third degree when he
"knowingly enters or remains unlawfully in a building or upon
real property which is fenced in or otherwise enclosed in a

manner designed to exclude intruders").[4]

The cases the defendant cites to the contrary are distinguishable on their facts.  In both People v. Powell, 180 Misc. 2d 627, (N.Y. Sup. Ct. 1999), and United States v. Breedlove, 424 F. Supp. 2d 379 (D. Conn. 2006), there were no signs posted in the relevant locations forbidding trespassers, or any other evidence that the entrances to the areas where the defendants were found were blocked by gates or fences.  See Powell, 180 Misc. 2d at 632-33; Breedlove, 424 F. Supp. 2d at 385.  With nothing to indicate that the premises in question were off limits, there was no reasonable basis for the officers to conclude that the defendants knowingly entered the premises unlawfully.  See Powell, 180 Misc. 2d at 633.  Breedlove, 424 F. Supp. 2d at 384.

In this case, notwithstanding the defendant's assertions to the contrary, see Def. Mem. at 13-14, there is every indication that the courtyard where the defendant was found was closed off to the public.  The metal gate clearly separates the courtyard from the sidewalk and the "no trespassing" sign

---

[4]  The defendant is incorrect that the Court should infer that the unidentified male talking to the defendant in the courtyard was a tenant of the building because he went inside the building when Officer Ponce approached.  See Def. Mem. at 13.  The fact that the defendant could not identify him and stated that he did not know anyone in the building raises the opposite inference.

posted on the left-hand side of the building reinforces that this
area is not open to the public.  It is immaterial that the door
to the gate was open when Officer Ponce saw the defendant.  (Tr.
173).  The door has to open to allow tenants access to the front
door.  The open door therefore does not render the courtyard
"open to the public," or detract from the clear message of the
gate and the "Clean Halls" posting on the side of the building,
which is that the courtyard is off limits to the public.  Any
reasonable police officer on the scene would have thought that
the gate and the sign were meant to exclude trespassers from the
courtyard.  Accordingly, once Officer Ponce determined that the
defendant had no legitimate business being on the Premises, he
had probable cause to arrest of the defendant for trespass.[5]

### MAY 2, 2007 ARREST

A.   The Testimony of Officer Maier and Lieutenant McMahon
     Was Consistent And Established That The Door Of The
     Apartment Was Open And That The Defendant's Drug
     Packaging Activity Was Exposed To Public View

The defendant asserts in his post-hearing memorandum
that the testimony of Officer Maier and Lieutenant McMahon at the
suppression hearing demonstrated that the officers "pushed open

---

[5]  The defendant also argues that the statements made by the
defendant in the car on the ride back to the precinct must be
suppressed as fruit of the poisonous tree.  See Def. Mem. at 17-
20.  Because the arrest of the defendant was lawful, the
defendant's spontaneous statements in the car are properly
admissible, and should not be excluded under this doctrine.

the door to apartment 3B, because they smelled marijuana coming from the apartment," and that their warrantless entry into the apartment was therefore illegal. Def. Mem. at 21. The defendant then points to several alleged inconsistencies in the testimony of Officer Maier and Lieutenant McMahon that supposedly support this conclusion. Id. at 21-23. As with Officer Ponce's testimony, the points raised by the defendant do not support his speculative version of events. Rather, the testimony of the two officers was highly consistent and clearly established that the defendant exposed his drug packaging activity to public view through the open door of Apartment 3B (the "Apartment"). As a result, the officers' entry into the Apartment was lawful and supported by exigent circumstances.

As an initial matter, there is simply no evidence to support that the officers pushed open the door to the Apartment in order to investigate the source of the marijuana. In fact, Lieutenant McMahon specifically testified that the smell of marijuana smoke coming from inside an apartment usually would not be enough, on its own, to justify entering an apartment without a warrant, and that he did not intend to enter the Apartment in this case based solely on te smell of marijuana. (Tr. 126).

Furthermore, most of the alleged inconsistencies that the defendant points to are either (1) mischaracterizations of

15

the officers' testimony, (2) testimony that cannot fairly be considered inconsistent, or (3) minor differences in recollection on inconsequential details. For example, the defendant highlights that Officer Maier testified that the woman standing in the threshold of the Apartment, Miriam Moreno, was "fiddling" with the door, while Lieutenant McMahon testified that she was simply standing in the threshold. See Def. Mem. at 21; Tr. 50, 124. The defendant also points out that Officer Maier testified that he asked Ms. Moreno a few questions, but that Lieutenant McMahon testified that he did not remember hearing any questions. See Def. Mem. at 21; Tr. 36-37, 125.

To the extent that these statements can be considered inconsistent, they differ on details of no significance. The officers were completely consistent as to the important facts, which were that Ms. Moreno was standing in the threshold of the Apartment on the left-hand side of the door frame, the door was open, and marijuana smoke appeared to be coming from inside the Apartment. (Tr. 33-36, 103-05). Hence, these minor inconsistencies have no bearing on the officers' credibility. See, e.g., United States v. Shyne, No. S4 05 Cr. 1067 (KMK), 2007 WL 1075035, at *23 (S.D.N.Y. April 5, 2007) (minor contradictions in agents' testimony not relevant to their overall credibility because "[t]he agents agreed more than they differed, and some

16

differences are to be expected four months after the event occurred"); United States v. Mannino, 487 F. Supp. 508, 511, (S.D.N.Y. 1980) ("[S]mall differences in testimony are inevitable . . . [and] strengthen, rather than detract from, the impression of credibility.").

Other points that the defendant raises are simply inaccurate. The defendant claims that Lieutenant McMahon testified that unless an officer placed his head over the threshold and inside the Apartment, he would not be able to see the living room. Def. Mem. at 9, 21-22. Lieutenant McMahon said nothing of the sort. Lieutenant McMahon was clear that an officer who was positioned on the right-hand side of the door frame, as he was, would have to peer over the threshold to see the living room. (Tr. 133) ("whoever was standing out to this side behind me in the landing area" would not have been able to see the living room without peering across the threshold) (emphasis added). However, he was equally clear that an officer who was positioned on the left-hand side of the door frame, like Officer Maier, would not have to do this. (Tr. 149).

The defendant also mistakenly asserts that Officer Maier testified that he went into the Apartment first, whereas Lieutenant McMahon testified that he entered first. Def. Mem. at 23. Officer Maier clearly testified that Lieutenant McMahon

entered the Apartment first. (Tr. 40-41). Hence, the officers'
testimony is consistent on this point. (Tr. 40-41, 112).[6]

Finally, the defendant raises Officer Maier's initial
mistaken recollection of the position of the door as evidence
that he was fabricating his account that he could see the
defendant in the living room of the Apartment through the open
door. See Def. Mem. at 22. Officer Maier testified candidly
that his initial recollection of the position of the door was
simply the product of faulty memory of an incident that occurred
almost nine months before, and that his recollection was
refreshed after revisiting the scene of the arrest. (Tr. 38-39,
51-56). There is no reason to doubt Officer Maier's testimony,
particularly in light of the fact that Lieutenant McMahon
testified to the same material facts regarding the position of
the door and the view into the living room.

Also, Officer Maier's credibility is not affected by
the DA summary that he was shown on cross-examination. (3503-S).
Officer Maier never reviewed that document for accuracy, nor did
he swear to its contents. (GX-13). Moreover, the only

_____

[6] The defendant also points out that Officer Maier testified that
he questioned the defendant after his arrest, while Lieutenant
McMahon testified that he questioned the defendant. Def Mem. at
23. This is not inconsistent in any way. There is no reason to
think that both officers could not ask questions of the defendant
after his arrest.

difference that the summary potentially shows is the order of events that occurred after the officers entered the Apartment. The summary is entirely consistent with Officer Maier's testimony on the relevant evidence – where the defendant and the others in the Apartment were located, what they were doing, and what evidence was recovered near them. Furthermore, the summary does not say anything contradicting that Officer Maier could see the living room from the left-hand side of the door frame. (3503-S). Accordingly, the document does not impugn Officer Maier's credibility concerning the circumstances surrounding the officers' entry into the Apartment.

In sum, the testimony of Officer Maier and Lieutenant McMahon established that the door to the Apartment was open when they arrived on the third floor landing, not that the officers pushed it open, and that the defendant was visible from the left-hand side of the door frame packaging a large amount of crack cocaine. The defendant's speculations to the contrary should not be credited.

B.    The Officers' Entry Into The Apartment Did Not Violate The Defendant's Fourth Amendment Rights And Was Supported By Exigent Circumstances

As argued in the Government's initial memorandum in response to the defendant's motion, because the defendant exposed his drug packaging activity to the public through the open door

19

of the Apartment, he forfeited any reasonable expectation of privacy, and therefore any Fourth Amendment protection, over what the officers saw from the hallway.  See United States v. Fields, 113 F.3d 313, 321 (2d Cir. 1997) (no reasonable expectation of privacy, and therefore no Fourth Amendment protection, in what a person "chooses voluntarily to expose to public view"); See United States v. Gori, 230 F.3d 44, 53 (2d Cir. 2000)(no reasonable expectation of privacy in what can be seen from a public hallway through the open door of an apartment).

Furthermore, for the reasons explained in the Government's initial memorandum, the officers had exigent circumstances to enter the Apartment making their warrantless entry lawful.  See Government's Post-Hearing Memorandum of Law in Response to Defendant's Motion to Suppress at 29-33. Accordingly, all of the evidence that was seized in plain view, including the crack cocaine and other drug paraphernalia recovered from the living room and the bedroom, is properly admissible at trial, see Gori, 230 F.3d at 50 (warrant not required to seize "an item in plain view if there is cause to believe that it is evidence of crime"), as are the defendant's post-arrest statements to the officers.  See United States v. Gotchis, 803 F.2d 74, 79 (2d Cir. 1986).

20

<u>**CONCLUSION**</u>

For the reasons set forth above, defendant Felix Cruz's motion to suppress should be denied in all respects.

Dated:     New York, New York
           March 24, 2008

                         Respectfully submitted,

                         MICHAEL J. GARCIA
                         United States Attorney
                         Southern District of New York

                    By:   /s/ Christian R. Everdell
                         CHRISTIAN R. EVERDELL
                         Assistant United States Attorney
                         Telephone: (212) 637-2556

21

<u>CERTIFICATE OF SERVICE</u>

CHRISTIAN R. EVERDELL deposes and says that he is employed in the Office of the United States Attorney for the Southern District of New York.

That on March 24, 2008, he caused to be served a copy of the foregoing Government's Post-Hearing Memorandum of Law in Further Response to Defendant's Motion to Suppress by hand delivery on:

> Robert M. Baum, Esq.
> Federal Defenders of New York
> 52 Duane Street, 10th Floor
> New York, N.Y. 10007
> (212) 417-8760

I declare under penalty of perjury that the foregoing is true and correct. 28 U.S.C. Section 1746.

> /s/ Christian R. Everdell
> CHRISTIAN R. EVERDELL

Executed on: March 24, 2008
                New York, New York

22